IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 05-77-GMS |
| | ) | |
| LEONARD BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF THE UNITED STATES REGARDING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE

**NOW COMES** the United States of America, by and through its attorneys Colm F. Connolly, United States Attorney for the District of Delaware, and Christopher J. Burke, Assistant United States Attorney for the District of Delaware, and hereby provides the Proposed Findings of Fact and Conclusions of Law of the United States Regarding Defendant's Motion to Suppress Evidence.

**I.    Proposed Findings of Fact**

Near midnight on May 30, 2005, Delaware State Police officers were patroling the area around a Holiday Inn that is located at 1201 Christiana Road in Newark, DE, at the intersection of Route 273 and Harmony Road. *See* Suppression Hearing Transcript ("Tr.") at 3-4. Senior Probation Officer Mark Lewis, who was on duty that evening in his capacity as a member of the Governor's Task Force ("GTF")[1], was parked in his unmarked police vehicle with his partner in

---

[1]  Officer Lewis testified that the GTF is a partnership between the Delaware Department of Corrections and the Delaware State Police, which includes five state troopers and three probation officers. Tr. at 3. He explained that the GTF's main duties are to patrol crime "hot spots" and to monitor the activities of probationers, such as by doing curfew checks. *Id.*

front of the Holiday Inn. Tr. at 3-5. The rest of the GTF was on duty in the surrounding area, including Detective Dewey Stout, who was in his police vehicle in the parking lot of a Getty gas station just west of the motel. Tr. at 5, 43.

At approximately 11:30 p.m., Officer Lewis observed a security guard walking back and forth in front of Oliver's Restaurant, a restaurant that is a part of the Holiday Inn and that is attached to the motel. Tr. at 5-6. Officer Lewis testified that the restaurant appeared to be closed, because the lights in the main dining area were out and because he had been sitting in the parking lot for ten or fifteen minutes and had seen no patrons entering or exiting the restaurant at that late hour. Tr. at 10, 36.

Approximately ten minutes later, the security guard came outside again, and walked to the southwest side of the restaurant, where he stood for several minutes. Tr. at 7, 59. The security guard then made a hand gesture toward a vehicle, a mid-1990s model four-door sedan. Tr. at 7. The vehicle pulled into the parking lot and made an immediate right, pulling around to the back of the restaurant. *Id.* The security guard went back inside on foot. Tr. at 7, 37-38.[2] At this point, Officer Lewis started his vehicle in order to see what was going on. Tr. at 7. He drove around the motel in a clockwise fashion. Tr. at 7.

As Officer Lewis and his partner came around to the back of the motel, he observed the sedan pull into a parking spot behind the restaurant, about 25 to 30 feet from the rear door of the restaurant. Tr. at 8, 39. Officer Lewis drove by the sedan, approximately ten feet away from the car, at which point he saw the security guard place a large object into the sedan's trunk. Tr. at 8.

---

[2] Officer Lewis saw the security guard re-enter the building through a "joint entrance" to the motel/restaurant complex, which allowed access to the motel if one bore left, or to the restaurant if one bore right. Tr. at 37-38.

Officer Lewis could see that the object was approximately four feet long and was wrapped in plastic. Tr. at 40-41. Officer Lewis then radioed the rest of the GTF what he had just observed and asked the unit to respond to the back of the restaurant, as he believed a theft might be occurring. Tr. at 9-10, 45. Officer Lewis explained that he made this request for a number of reasons, including that (1) he had seen a non-commercial vehicle pull up to the back of a restaurant and have its trunk loaded; (2) the restaurant appeared to be closed; and (3) it was very late at night. Tr. at 10.

Officer Lewis then pulled back around to the back of the restaurant. *Id.* As he did so, he saw the driver of the vehicle, whom he identified in court as the defendant, being taken out of the vehicle by Sergeant Sawyer, another member of the GTF. Tr. at 11, 22. When the defendant exited the vehicle, he stood no more than five feet away from it, near the driver's door. Tr. at 11, 46. The security guard was standing near the right rear portion of the vehicle, on the passenger's side. Tr. at 12, 45.

As Officer Lewis exited his vehicle, he could see that the trunk of the defendant's sedan was still open. Tr. at 12. Inside the trunk, in plain view, he could see a side of beef wrapped in clear, freezer-wrap packaging and a six-pack of Heineken beer. Tr. at 13. None of the officers attempted to search the rest of the trunk at that time. *Id.* The officers could also see that the restaurant's back door was open. Tr. at 55.

Detective Stout, who had also arrived on the scene, requested identification from both men. Tr. at 46. The defendant subsequently provided Detective Stout with a Delaware driver's license in the name of Keenan Bethly and another piece of identification with the same name.

Tr. at 13-14, 24, 47.[3] Detective Stout did a check on the license, which did not indicate that there were any outstanding warrants for a Keenan Bethly. Tr. at 25, 47. He also ran a check on the car's Delaware license plate, which came back as being registered to Keenan Bethly. Tr. at 47-48. The security guard identified himself as Reginald Armstrong. Tr. at 14, 46. A warrant check revealed that Mr. Armstrong was wanted for failure to pay fines. Tr. at 47.

The defendant and the security guard were questioned by the officers as to what they were doing in the rear of the restaurant at that hour. Tr. at 13. Officer Lewis heard the defendant say that he knew the cook at the restaurant, that the cook had ordered too much meat for a party held earlier that day at the restaurant, and that the defendant had made arrangements with the cook to purchase the excess meat and some beer. Tr. at 13, 26, 48. Detective Stout also heard the defendant state that he paid $25 for these items and that he had come to the restaurant to pick up the items from Mr. Armstrong. Tr. at 48. As far as the officers could tell, there was no one in the restaurant at this time. Tr. at 26.

At this point, the officers determined that they should try to confirm whether what the defendant and Mr. Armstrong were telling them was in fact the truth. Tr. at 48-49. To that end, Sgt. Sawyer went into the lobby of the Holiday Inn and made contact with the motel manager, to ask whether Mr. Armstrong had authorization to remove the property from the motel's restaurant. Tr. at 14, 49. The manager came outside to the back of the restaurant and was apprised of what the officers knew about the situation. Tr. at 14, 27.

---

[3] At the time, the officers were not aware that Keenan Bethly was a fictitious name for the defendant. Tr. at 24.

When he arrived at the rear of the restaurant, the manager said that the motel's employees do not "sell meat out of the back of the restaurant in the middle of the night," stating that this was "not the way they conduct business there." Tr. at 14. The manager stated that the security guard had no right to be taking items out of the back of the restaurant and said that the motel's property was being stolen. Tr. at 15, 49. Officer Lewis recalled the manager telling Mr. Armstrong, "Reggie . . . I am very disappointed in you." Tr. at 15. The officers then handcuffed the defendant and Mr. Armstrong. Tr. at 15, 49. Approximately ten minutes had passed since the officers had first arrived on the scene. Tr. at 55.

Officer Lewis and Detective Stout then proceeded to search the defendant's vehicle. Tr. at 15. Detective Stout entered the driver's side and saw approximately one gram of marijuana on the floor, around the center console area. Tr. at 50. He also found four ecstasy pills underneath the seats. *Id.*

Officer Lewis, who had seen that the drugs had been found, was on the passenger's side of the car, searching the dashboard and front passenger compartment. Tr. at 15, 50. In conducting his search, he opened the front glove box, which was unlocked, and "opened up farther than [a] normal glove box would open." Tr. at 15-16. As it did so, a two-inch gap "big enough to stick your hand in" appeared in the back of the glove box, which allowed access into the dashboard of the vehicle. Tr. at 16.

Officer Lewis put his hand inside the gap and reached "off to the right-hand side of the dashboard" on the "frame that came down along the side of the dashboard." Tr. at 16-17. There he found a latex glove. Tr. at 16. Through the glove he could feel heavy items, which through his training and experience he could identify as bullets. *Id.* He looked inside the glove and

5

found 16 rounds of nine-millimeter ammunition, which he turned over to Detective Stout. *Id.* Officer Lewis then pushed down on the top of the glove box and continued searching the dashboard frame. Tr. at 17. As he did so, he located a Smith & Wesson .38 caliber revolver "on the bottom frame" of the dashboard, about two feet from where the glove was found. *Id.* Officer Lewis determined that the handgun was a five-shot revolver and was loaded with four rounds of ammunition and one spent round. Tr. at 18. The gun was then photographed and confiscated by another officer. *Id.*

No other items, aside from the side of beef and six-pack of beer, were found in the car's trunk. Tr. at 18. The defendant was then searched by Detective Stout. Tr. at 51-52. In the defendant's right front pants pocket Detective Stout found over $1,500 in cash. Tr. at 52.

Detective Stout also testified that when an individual is arrested while with his or her vehicle, as in this case, the written policy of the Delaware State Police calls for officers to tow the vehicle. Tr. at 52-53. If the officers tow the vehicle, Detective Stout explained, they must first conduct an inventory of the vehicle's contents, including closed containers, and document what they find, pursuant to guidelines set forth in the policy. Tr. at 53-54. Detective Stout testified that he had conducted hundreds of such inventory searches in the past and believed that the Smith & Wesson firearm and ammunition would have been found as part of such a search. *Id.* He explained that an inventory search would have included a check of the glove box which, when opened, would have dropped down in the same way it did when Officer Lewis opened it. *Id.* Detective Stout stated that a trooper would have looked behind the glove box and found the items of contraband. *Id.*

**II.     Proposed Conclusions of Law**

In this case, the GTF officers acted appropriately under the law, based upon the facts that they were confronted with at each stage of their investigation. As a result, their search for and seizure of evidence was in compliance with the Fourth Amendment. Therefore, the defendant's motion for suppression of (1) the Smith & Wesson revolver; (2) the one gram of marijuana; (3) the four tablets of Ecstasy; and (4) the over $1,500.00 in United States currency should therefore be denied.

### A. The Officers Had Reasonable Suspicion to Believe that a Crime Was In Progress, Sufficient to Justify Their Brief Detention of the Defendant.

As an initial matter, by the time the police officers began to question the defendant, they had reasonable suspicion to believe that a crime was in progress. Under the law as set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny, an officer, without a warrant, "may consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also Terry*, 392 U.S. at 22-24. In order to take this action, the officers must be in possession of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the actions they took. *Terry*, 392 U.S. at 21.

The Supreme Court has stated that reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123. The Court has elaborated that "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White,*

496 U.S. 325, 330 (1990). As a result, officers need only to possess a "minimal level of objective justification" to support a *Terry* stop, taking into account "the totality of the circumstances – the whole picture." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations and quotation marks omitted).

It is also well settled that a law enforcement officer's personal observations and "commonsense judgment and inferences about human behavior" provide the primary basis for his or her reasonable suspicion of criminal activity. *Wardlow*, 528 U.S. at 124. To that end, courts must afford considerable deference to those personal observations and conclusions, on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Indeed, the Third Circuit has described the standard for reasonable suspicion as "accord[ing] great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002).

In this case, by the time they began asking questions of the defendant and Mr. Armstrong, the GTF officers had more than the required minimal level of objective justification to believe that a crime may have been in progress. They had initially seen the defendant's car pull up to the Holiday Inn at the direction of Mr. Armstrong and go directly to the back of Oliver's Restaurant. Tr. at 7. Then Officer Lewis saw Mr. Armstrong loading a large item wrapped in plastic into the trunk of the vehicle. Tr. at 8, 41. The defendant's car was a four-door sedan, not a commercial vehicle. Tr. at 7. As a result of processing just these initial facts, the officers could reasonably infer that whatever transaction was occurring at the back of the motel's restaurant, it was not

likely one that was part of a standard, commercial relationship between the restaurant and one of its vendors.

In addition, the restaurant appeared to be closed, which further increased the officers' suspicion. The officers could reasonably conclude that most legitimate transactions that involve restaurants occur during normal, operating business hours, at a time when the lights of the restaurant are on, when restaurant employees are visible and when patrons are moving in and out of the building. In this case, Officer Lewis testified he had been in the parking lot in front of the restaurant for ten or fifteen minutes and had seen no one entering or exiting the restaurant, had seen that the lights of the restaurant's dining room were off and had seen no other members of the restaurant's staff in the area. Tr. at 10, 26.

Another factor that relates to the reasonableness of the officers' suspicions was the fact that this activity was taking place just before midnight. That fact further supported the officers' conclusion that the restaurant was closed, as it is a reasonable assumption that many restaurants are not open nor operating near midnight, particularly those with their dining room lights shut off and no patrons visible in the building. It also provided additional reason for the officers to be suspicious about the nature of the transaction, as courts have held that when suspected criminal activity occurs at late hour, such as near or before midnight, that fact would give a reasonable officer more cause for concern than if the activity had occurred earlier in the day. *See Michigan v. Long*, 463 U.S. 1032, 1035, 1050-51 (1983) (*Terry* stop for protective search justified due in part to fact that "hour was late," when stop occurred on rural road "shortly after midnight"); *United States v. Ramires*, 307 F.3d 713, 714, 716 (8th Cir. 2002) (*Terry* stop of suspect justified in part due to fact that suspect detained "late at night" at apartment complex, "around 9:00

p.m."); *United States v. Martin*, 155 F. Supp.2d 381, 383, 385 (E.D. Pa. 2001) (*Terry* stop of suspect in car on residential street justified in part by fact that it occurred "late at night" at around "11:00 p.m.") *United States v. Kimball*, 813 F. Supp. 95, 97-98 (D. Me. 1993) (*Terry* stop justified in part due to fact that it occurred "late at night" in school parking lot after school hours, where stop made "shortly after midnight"). The fact that this activity took place near midnight in the back of a restaurant that appeared to be closed is thus also significant in assessing the reasonableness of the officers' belief that a crime was occurring.

Upon drawing closer to the defendant's vehicle, as Officer Lewis testified, the officers could see in plain view that the defendant's trunk contained prime rib wrapped in clear packaging, as well as a six-pack of beer. Tr. at 13.[4] The back door of the restaurant was also open. Tr. at 55. At this point, the officers would have been able to make a connection between these facts and the facts that Officer Lewis had observed just moments earlier, suggesting that the security guard had emerged from the back of the restaurant and that the item that had been placed into the trunk of the defendant's car was a large side of prime rib.

Thus, at the time the officers detained the defendant for questioning, they reasonably believed that the defendant and Mr. Armstrong were engaged in a transaction involving the exchange of a large side of meat, which had been taken from the back of a darkened, apparently closed restaurant and placed into a non-commercial vehicle, just prior to midnight. As the motel's manager aptly summarized when he came out to view the scene, it is highly unusual to

---

[4] The officers' viewing of these items, which were visible to Officer Lewis as he approached the defendant, was not violative of the Constitution. *See Texas v. Brown*, 460 U.S. 730, 738 (1983) (finding that plain-view observations by an officer properly in a position to have such a view do not constitute unreasonable searches under the Fourth Amendment).

see people "sell[ing] meat out of the back of [a] restaurant in the middle of the night." Tr. at 14. Of course, the defendant's conduct could have been susceptible to some innocent explanation. *See United States v. Rickus*, 737 F.2d 360, 365 (3rd Cir. 1984) (citation omitted) (emphasis in original) (noting fact that defendants' behavior could have been subject to innocent explanation does not preclude presence of reasonable suspicion, as "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation"). However, in this case Officer Lewis and Detective Stout, law enforcement officers with over twenty years of experience between them, testified that these facts suggested to them that a theft of the motel's property might be in progress. The officers' belief was reasonable under the law, and provided them with sufficient basis to investigate further, in order to resolve any ambiguity. *United States v. Valentine*, 232 F.3d 350, 355 (3rd Cir. 2000) (noting that if facts are susceptible to innocent explanation, but also could reasonably suggest unlawful activity, *Terry* permits officers to detain individuals briefly to "resolve ambiguity").

The officers then took measured, appropriate actions in an attempt to assess the situation. As Officer Lewis and Detective Stout testified, they next simply asked questions of the defendant and Mr. Armstrong in order to determine each man's identity, as well as what they were doing at the rear of the restaurant at that hour – all permissible actions to take at that stage of the inquiry. *See* Tr. at 13, 46-48; *see also United States v. Sharpe*, 470 U.S. 675, 697 (1985) (Marshall, J., concurring) (stating that during a proper *Terry* stop, an officer may "briefly stop [the] person, ask questions, or check identification, . . . and, if warranted, [] conduct a brief pat-down for weapons") (citation omitted). When the defendant told the officers that he was purchasing excess meat from the motel restaurant's cook, for which he had paid $25, Tr. at 13, 26, 48, the officers

sought out the person whom they believed could best verify the accuracy of the defendant's story – the motel's manager. But when the officers questioned the manager, after briefing him on what they knew to that point, the manager made it clear that neither Mr. Armstrong nor any other motel employee had the right to sell any items from the motel's restaurant. Tr. at 14. Instead, he stated his belief that the defendant and Mr. Armstrong were participating in theft of motel property, which led to the defendant being subsequently handcuffed and arrested. Tr. at 14, 49.

    **B.**    **The Officers Had Probable Cause For the Arrest, Which Entitled Them to Lawfully Search the Defendant's Vehicle and Uncover the Contraband At Issue.**

These facts clearly indicate that, at the time of the defendant's arrest, the officers had probable cause to believe that he had committed a crime. The Supreme Court has stated that probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *See Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979) (citation omitted). In addition to the facts discussed above in the *Terry* analysis – which suggested that the defendant was engaged in a transaction that involved an exchange of the restaurant's meat – now the defendant had confirmed that fact.[5] And the explanation he gave – that he had purchased the excess meat from a motel restaurant employee – was directly contradicted by the person on the scene who was most

---

    [5]    At the suppression hearing, defendant's counsel asked Officer Lewis whether the motel's manager had been able to identify the prime rib as belonging to Oliver's Restaurant when he saw it, suggesting that the lack of a restaurant label on the meat cast some doubt on whether the meat actually came from the restaurant. Tr. at 26-27; *see also* Tr. at 74. However, that fact had been confirmed by the defendant himself a few minutes before, when he told the officers that the meat had been purchased for the restaurant for a party earlier that day. Tr. at 13. Thus, the fact that the meat had come from the restaurant would not have been reasonably in dispute at that point.

likely to be able to confirm or reject its accuracy: the motel's manager, who oversees motel employees and motel policy. These facts would indicate to a prudent person that the defendant and Mr. Armstrong had been engaged in the crimes of theft and receiving stolen property.[6]

Once the officers had probable cause to lawfully arrest the defendant[7], who had occupied his vehicle up through the time when the officers approached the scene, Tr. at 11, 22, the officers were entitled to search the entire passenger compartment of the defendant's car as a contemporaneous incident of that arrest. *See Thornton v. United States*, 124 S.Ct. 2127, 2129 (2004); *see also United States v. Mighty*, No. Crim. A. 04-54-GMS, 2005 WL 950627 at *10 (D. Del. Apr. 26, 2005) (Sleet, J.). The resulting seizure of the handgun, the ammunition and the drugs from the vehicle were therefore justified on this basis.

Moreover, because the police had probable cause to believe that evidence of a crime was located in the defendant's car, they were entitled to search the entirety of the car for that evidence, pursuant to the automobile exception to the search warrant requirement. *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). In this case, the officers had seen the prime rib being loaded from the motel into the car's trunk – an item that the motel's manager confirmed that Mr. Armstrong did

---

[6] As the enclosed Stipulation indicates, the defendant was later charged by the State of Delaware with crimes arising out of these events, including Theft and Receiving Stolen Property. Mr. Armstrong was charged with Theft, along with another crime.

[7] The defendant's person was searched only subsequent to his arrest, uncovering the more than $1,500.00 in United States currency located in the defendant's right front pants pocket. Tr. at 52. Because the corresponding arrest was justified, the search for and seizure of this currency incident to arrest was also justified.

not have the authority to sell. In these circumstances, as Officer Lewis testified, the officers had probable cause to believe that other evidence relating to the apparent crime – such as money used to pay for the stolen items or evidence that facilitated the crime, such as a cell phone – might be stored in other parts of the car's passenger compartment. Tr. at 30. As a result, the officers' subsequent search of the passenger compartment, including the glove compartment, was separately justified on these grounds.[8] *Cf. Rickus*, 737 F.2d at 367 (finding that evidence suggesting that car's occupants had or might commit crime of burglary, including a screwdriver and pliers spied on car's floor, provided probable cause to search car's trunk for additional evidence of crime); *United States v. Shepherd*, 714 F.2d 316, 319-20 (4th Cir. 1983) (finding that agents' observation of defendant placing jugs into trunk of car, coupled with other information known to agents suggesting defendant was engaged in illegal whiskey enterprise, provided probable cause to search entire car for other evidence of enterprise).

In addition, the seizure of the handgun, ammunition and drugs should also be upheld on the grounds that the evidence would inevitably have been discovered, even had the officers not searched the car at the time of the arrest. As Detective Stout testified, the Delaware State Police's procedures dictate that an inventory search of the entire vehicle, including closed containers, should be conducted after such an arrest, prior to the vehicle being towed away. Tr. at 52-54. Detective Stout, who had conducted hundreds of such searches in the past and was familiar with where the contraband in this case was found, testified that the handgun, ammunition and drugs would have inevitably been discovered during such a search. Tr. at 53-54.

---

[8] For the same reasons, even if the Court were to find that the officers had probable cause to arrest Mr. Armstrong, but not the defendant, the automobile exception to the search warrant rule would still have permitted them to search the vehicle.

For this reason as well, those items should not be suppressed. *See United States v. Vasquez de Reyes*, 149 F.3d 192, 195 (3rd Cir. 1998) (noting that evidence obtained from unlawful search of vehicle will likely be admitted when police show that evidence would have been inevitably discovered in inventory search conducted after impoundment) (citing *United States v. Haro-Salcedo*, 107 F.3d 769 (10th Cir. 1997)); *see also United States v. Johnson*, 112 Fed. Appx. 138, 139-40 (3rd Cir. 2004) *United States v. Woody*, 55 F.3d 1257, 1270 (7th Cir. 1995).

**WHEREFORE,** the United States requests that the Court deny the defendant's Motion to Suppress.

>Respectfully submitted,
>
>COLM F. CONNOLLY
>UNITED STATES ATTORNEY
>
>BY: ____/s/____
>Christopher J. Burke
>Assistant United States Attorney

Dated: February 17, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Criminal Action No. 05-77-GMS |
| LEONARD BETHLY, | : |
| Defendant. | : |

### CERTIFICATE OF SERVICE

I, Christopher J. Burke, Assistant United States Attorney for the District of Delaware, hereby certify that on the 17th day of February 2006, I caused to be electronically filed a **Proposed Findings of Fact and Conclusions of Law of the United States Regarding Defendant's Motion to Suppress Evidence** with the Clerk of the Court using CM/ECF. Said document is available for viewing and downloading from CM/ECF. I further certify that a copy of the foregoing was mailed via first class mail to counsel of record as follows:

Elliot Cohen
Two Penn Center Plaza
15th and JFK Boulevard, Suite # 1516
Philadelphia, PA 19102

/s/
Christopher J. Burke
Assistant United States Attorney