IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 05-77 GMS |
| | ) | |
| LEONARD BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

**I.   INTRODUCTION**

On August 11, 2005, the Grand Jury for the District of Delaware indicted Leonard Bethly ("Bethly") on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Presently before the court is Bethly's Motion to Suppress Evidence.[1] The court held an evidentiary hearing in connection with this motion on January 11, 2006. The court subsequently directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, because the court concludes the investigatory stop was legal and that the seizure of contraband from the car of which Bethly was a recent occupant and from his person was incident to an arrest supported by probable cause, the court will deny Bethly's motion.

**II.   FINDINGS OF FACT**

---

[1] Bethly's motion seeks to suppress a Smith & Wesson revolver, sixteen rounds of nine millimeter ammunition, one gram of marijuana, and four ecstasy pills that were seized from his vehicle on May 30, 2005. Bethly also seeks to suppress $1583.00 of United States currency seized from his person on that same date.

At the evidentiary hearing, the United States called two witnesses: Mark Lewis ("Lewis"), a Senior Probation Officer employed by the Delaware Department of Corrections (the "DOC"), and Detective Dewey Stout ("Stout"), a Delaware State Police (the "DSP") detective. Both men were also members of the Governor's Task Force (the "GTF")[2] during the time in question. Bethly did not call any witnesses. After listening to the testimony of each witness, and observing the demeanor of each, the court concludes that Lewis' and Stout's accounts of the facts are credible. The following represents the court's essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

At approximately 11:30 p.m., on May 30, 2005, Lewis was on duty with Senior Probation Officer James Kelly ("Kelly") in the parking lot of a Holiday Inn, located 1201 Christiana Road, Newark, Delaware, at the intersection of Route 273 and Harmony Road. *See* Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 3-4. According to Lewis, the entire GTF was on duty that night in the vicinity of the Holiday Inn because, through prior arrests and gathering intelligence, they learned that there was a large drug traffic in the area near the Shell gas station at the intersection of Route 273 and Harmony Road. *Id.* at 5-6.

Lewis observed a security guard walking back and forth in front of Oliver's Restaurant ("Oliver's"), which is part of the Holiday Inn and attached to the motel.[3] *Id.* at 5-6. Lewis testified

---

[2] Lewis testified that the GTF is a partnership between the DOC and the DSP, which includes five state troopers and three probation officers. *See* Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 3. The members of the GTF include Lewis, Senior Probation Officers James Kelly and Edwards, Sergeant Sawyer and Detectives Stout, Sebastianelli and Popp. *Id.* at 5. Lewis further testified that the main duties of the GTF are to "patrol crime hot spots" and "conduct curfew checks" to monitor the probationers. *Id.* at 3.

[3] According to Lewis, he knew the man walking back and forth outside the Holiday Inn was a security guard because he was dressed in a "security type" uniform, dark pants with a

that Oliver's appeared to be closed because the lights in the main dining area were out, and he had not observed any patrons entering or leaving Oliver's for about ten to fifteen minutes. *Id.* at 9-10, 36. Approximately ten minutes later, Lewis observed the security guard walk outside again, and proceed to the southwest side of the restaurant, where he made a hand gesture to a four-door sedan as it pulled into the motel parking lot. *Id.* at 7. The vehicle pulled into the parking lot, made an immediate right, and drove around to the back of Oliver's. *Id.* The security guard followed the vehicle on foot. *Id.* Lewis observed the security guard walk back inside the building through a "joint entrance" to the motel/restaurant complex, which allowed access to the motel if one turned left, or to Oliver's if one turned right. *Id.* at 7, 37-38. Lewis then started his vehicle and circled around the motel in a clockwise manner, to "see what was going on." *Id.* at 7.

As Lewis' vehicle approached the back of the motel, he observed the sedan pull into one of the three parking spots behind Oliver's, about twenty-five to thirty feet from the rear door. *Id.* at 8, 39. Lewis also observed the security guard place a large object into the trunk of the sedan, which was about ten feet away from his own vehicle. *Id.* at 8. Lewis could not determine what the object was, but was able to observe that the object was approximately three to four feet long and wrapped in plastic. *Id.* at 8, 40-41. Lewis continued driving past the sedan toward the front of the motel and radioed the rest of the GTF officers to tell them what he had observed, as he believed that a theft was occurring. *Id.* at 9-10, 45. According to Lewis, he briefed the GTF officers regarding what he saw and asked them to respond to the scene. *Id.* at 10. Lewis explained that he made the request for several reasons, including (1) it was late at night; (2) Oliver's appeared to be closed; and (3) the vehicle that pulled into the back of Oliver's was not a commercial vehicle. *Id.* at 10. Lewis testified

---

yellow stripe and a uniform jacket. Tr. at 6.

that the above-mentioned factors together led him to believe that there might be some criminal activity afoot. *Id.* at 10.

After notifying the GTF, Lewis pulled back around to the rear of Oliver's. *Id.* As he did, he observed the driver of the vehicle, whom he identified in court as the defendant, being asked out of the vehicle by Sergeant Sawyer of the GTF. *Id.* at 10-11. When the defendant exited the vehicle, he was standing approximately five feet away from it near the driver's door. *Id.* at 11. The security guard was standing at the right rear of the defendant's vehicle. *Id.*

Lewis then exited his vehicle and observed that the trunk of the car was still open. *Id.* at 12. Lewis walked over to the trunk and, in plain view, could see in the trunk a side of beef wrapped in clear freezer wrap and a six-pack of Heineken beer. *Id.* None of the other GTF officers attempted to search the rest of the trunk at that time. *Id.*

Stout, also on duty, was in an unmarked police vehicle in the parking lot of a Getty gas station just west of the motel. *Id.* at 5, 43. Prior to receiving Lewis' briefing over the radio, he observed a man, later identified as the security guard, wearing dark clothing walk from the rear of the motel to the west side of the building. Tr. at 44. Stout also observed a vehicle pull into the motel and head toward the back of the parking lot. *Id.* After receiving Lewis' request to respond, Stout pulled up to the back of the Holiday Inn and observed the security guard and driver standing outside the sedan. *Id.* at 45-46. Stout requested identification from the driver, who provided him with a Delaware driver's license and another document in the name of Keenan Bethly. *Id.* at 13-14, 24, 46-47.[4] Stout testified that he ran a computer check on the driver and the security guard, who was

---

[4] The officers were unaware at this time that Keenan Bethly was a fictitious name for the defendant. Tr. at 24.

4

identified as Reginald Armstrong ("Armstrong"). *Id.* at 47. A check on Keenan Bethly's licence did not indicate he had any outstanding warrants. *Id.* Stout also ran a check on the registration of the vehicle, which came back registered to Keenan Bethly. *Id.* The check on Armstrong revealed that he was wanted for failure to pay fines. *Id.*

Stout and some of the other GTF officers questioned Bethly and Armstrong regarding the incident. Tr. at 48. Stout testified that both Bethly and Armstrong indicated that Bethly had purchased some prime rib and some beer. *Id.* Stout recalled Bethly stating that he paid $25.00 and was at the motel to pick up his purchase. *Id.* According to Lewis, Bethly told the officers that he knew the cook at Oliver's, and that the cook had ordered too much meet for a party held earlier that day at the restaurant. Tr. at 13. Bethly had made arrangements with the cook to purchase the meat and some beer. *Id.* at 13; *see also* Tr. at 48 (Stout's testimony regarding Bethly's story). As far as the officers could tell, there was no one Oliver's at this time, but the joint door to the motel and Oliver's was open. *Id.* at 26, 55. Stout testified that the officers spent about five minutes talking to Bethly and Armstrong. *Id.* at 55.

Stout further testified that, since a motel security guard was involved in the transaction, the officers decided to try to confirm whether the story Bethly and Armstrong told was true. *Id.* at 49. According to Stout, Sergeant Sawyer went into the motel lobby looking for the manager, so he could determine whether Armstrong was allowed to remove the property from the motel. *Id.* at 14, 49. The manager came outside to the back of the restaurant, was apprised of the situation, and indicated that the property was being stolen. *Id.* at 14, 27-28, 49.[5] The officers then handcuffed Bethly and

---

[5] Lewis testified that the manager stated that the motel's employees "don't sell meat out of the back of the restaurant in the middle of the night." Tr. at 14. Lewis also recalled the manager telling Armstrong, "Reggie . . . I am very disappointed in you." *Id.* at 15.

Armstrong. Tr. at 15, 49. Approximately ten minutes had elapsed since the GTF officers arrived on the scene. *Id.* at 55.

Lewis and Stout then proceeded to search the sedan for evidence. Tr. at 15, 49. Stout entered the vehicle from and searched the driver's side, while Lewis entered from and searched the passenger side. *Id.* at 15, 49. Stout observed a small amount of marijuana on the floor in the center console area, as well as some ecstasy pills underneath the seats. *Id.* at 50. Stout collected the marijuana, about one gram, and four ecstasy pills from the vehicle. *Id.*

Lewis, who was searching the dashboard and front passenger compartment, opened the glove box, which was unlocked and "opened up farther than [a] normal glove box would open." Tr. at 15-16. The gap in the glove box opening was approximately two inches, or "big enough to allow [Lewis] to put [his] hand inside of it." *Id.* at 16. Lewis testified that he put his hand into the space created by the glove box and felt a latex glove as he reached off to the right hand side of the dashboard. *Id.* Lewis could feel heavy items through the glove, which, through his training and experience, he identified as bullets. *Id.* He proceeded to look inside the glove, where he found sixteen rounds of nine-millimeter ammunition. *Id.* Lewis then continued his search of the area around the glove box because, through training and experience, when he finds bullets he usually believes that there is also a gun in the area. *Id.* at 17. During his search, he found a Smith & Wesson .38 caliber revolver on the frame at the bottom of the dashboard behind the glove box, about two feet away from where he found the glove. *Id.* Lewis determined that the gun was a five-shot revolver and was loaded with four rounds of ammunition and one spent round. *Id.* at 18. The revolver was then photographed and confiscated by another officer. *Id.* No other items were found in the

passenger compartment of the vehicle. *Id.* Additionally, the only items found in the trunk of the vehicle were the side of beef and six-pack of beer. *Id.*

After concluding the search of the vehicle, Stout conducted a search of Bethly and found $1,583.00 dollars in cash in his right front pants pocket. Tr. at 51-52.

Stout also testified that the DSP has a written policy stating that when an individual is arrested while with his or her vehicle the standard operating procedure is to tow the vehicle. Tr. at 53. If the vehicle is towed, the officers are required to conduct an inventory of the vehicle's contents, including closed containers. *Id.* at 53-54. Stout further testified that he had conducted hundreds of inventory searches in the past and believed, based on his experience, that the firearm and glove would have been uncovered during a typical inventory search. *Id.* at 53-54. He explained that an inventory search would have included a search of the glove box. *Id.* Had an officer discovered during the inventory search that the glove box dropped down further than what a glove box would typically drop down, he would have looked behind the glove box and found the contraband items. *Id.*

## III.   DISCUSSION

### A.   The *Terry* Stop

In his motion to suppress, Bethly first contends that his seizure and questioning by the GTF officers ran afoul of the Fourth Amendment. The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a warrant. *See e.g., Katz v. United States*, 389 U.S. 347, 357 (1967). In the present case, the GTF officers' seizure of Bethly was not made pursuant

to a warrant. As a result, the Government bears the burden of demonstrating that Bethly's seizure was reasonable and falls within one of the exceptions to the warrant requirement. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

An officer without a warrant "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Robertson*, 305 F.3d 164, (3d Cir. 2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). Under *Terry* and its progeny, reasonable, articulable suspicion of criminal activity has been defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21.

Courts must consider the "totality of the circumstances" in determining whether such reasonable suspicion existed. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989). A law enforcement officer's personal observations and "commonsense judgment and inferences from human behavior" provide the primary basis for his or her reasonable suspicion of criminal activity. *Wardlow*, 528 U.S. at 124. Furthermore, courts must afford considerable deference to those personal observations and conclusions, on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 268 (2002). The Third Circuit Court of Appeals has described the *Arvizu* standard for reasonable suspicion as "accord[ing] great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002).

After having considered the "totality of the circumstances" in the present case, the court concludes that the GTF officers had a "reasonable and articulable suspicion" of criminal activity sufficient to support Bethly's seizure. Here, Lewis and Stout had five and two years experience,[6] respectively, with the GTF,[7] and had previously patrolled and/or made arrests in and around the area where the events in question occurred. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (finding experience of officers a relevant factor in determining if officers had reasonable suspicion). Additionally, the following facts were known to the GTF officers prior to approaching Bethly and Armstrong:

First, Bethly drove his car into the back parking lot of the Holiday Inn late at night, approximately 11:30 p.m., at the direction of what appeared to be a security guard. The lateness of the hour was one reason for the GTF officers to be suspicious about the nature of the transaction they

---

[6] Additionally, Lewis had approximately fifteen years experience as a probation officer, while Stout had approximately six years experience with the DSP at the time the events in question occurred.

[7] The defendant contends that the GTF officers provided no testimony as to how their law enforcement experience contributed to their determination that the acts they observed objectively justified their belief that the defendant and security guard were stealing motel property. (D.I. 24, at 5-6). The defendant further contends that the Government's reliance on *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002), for the proposition that reasonable suspicion "accord[s] great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis," is misplaced, because neither Lewis nor Stout testified with respect to their knowledge of how theft crimes are committed. (Id. at 6.) According to Bethly, the court should accord "no deference" to Lewis' and Stout's testimony that they believed a theft was occurring, because it is not predicated on any degree of experience with respect to the nature of the commission of theft crimes. The court disagrees. First, the court notes that Bethly correctly points out that much of the circuit case law addressing the issue of reasonable suspicion based on an officer's experience and observations has focused on the drug trade. Further, the court finds that, unlike cases involving drug trafficking and trade, no specialized training or experience is necessary in a theft or receiving stolen property case. In other words, the court believes that the crime of theft is within an ordinary officer's training and experience.

9

observed, as court's have held that activity occurring late at night justifies, in part, a finding of reasonable suspicion. *See Michigan v. Long*, 463 U.S. 1032, 1035, 1050-51 (1983) (finding a *Terry* stop justified due partly to the fact that the "hour was late," when the stop occurred "shortly after midnight"); *see also United States v. Johnson*, 238 F. Supp. 2d 663, 672 (D. Del. 2002) (concluding that *Terry* stop was justified due partly to the fact that the stop occurred "[a]t a relatively late hour of a weekday evening [10:50 p.m.]"); *United States v. Martin*, 155 F. Supp. 2d 383, 385 (E.D. Pa. 2001) (reasonable suspicion justified in part by lateness of the hour, i.e. around 11:00 p.m.).

Further, Bethly was driving a four-door sedan – not a commercial vehicle. It was into the trunk of this sedan that, after emerging from the motel/restaurant complex, Armstrong placed a three to four foot long object wrapped in plastic. Additionally, the restaurant appeared to be closed, as the lights in the main dining area were out and Lewis, who had been sitting on patrol in the parking lot in front of the restaurant for ten or fifteen minutes, had not seen any patrons entering or leaving the restaurant, or any members of the restaurant's staff in the area. Given these facts, the officers could reasonably infer that the transaction occurring at the back of the motel/restaurant complex was not part of a standard, commercial relationship between the restaurant and one of its vendors. Moreover, the court finds that it was reasonable for the officers to conclude that most legitimate transactions occur at a restaurant during normal business hours, when employees and patrons are visible. Thus, the combination of the lateness of the evening, the placing of the object in the non-commercial vehicle, and the fact that the restaurant appeared closed, lead the court to conclude that the officers had a reasonable and articulable suspicion sufficient to stop and question Bethly.[8]

---

[8] Moreover, while any one of these facts known to Lewis and the other GTF officers may also be interpreted as innocent behavior and, therefore, not raise reasonable suspicion on its own, the court concludes that, taken collectively and in the totality of the circumstances, Bethly's

Having found that the officers possessed the requisite reasonable suspicion to stop Bethly, the court must now examine the relative intrusiveness of the stop. *Rickus*, 737 F.2d at 366 (citing *Terry*, 392 U.S. at 18 n. 15, 88 S.Ct. at 1878 n. 15; *United States v. Mendenhall*, 466 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (Powell, J., concurring)). Here, the record evidence does not suggest that the GTF officers attempted to harass or intimidate Bethly or Armstrong. *See Rickus*, 737 F.3d at 366. When stopped, Bethly and Armstrong were in the back parking lot of the Holiday Inn. The officers merely requested identification from Bethly and Armstrong, performed a computer check on the identification, and briefly questioned the two regarding the incident. Bethly and Armstrong told the officers that Bethly had purchased prime rib and beer from a cook at the motel for $25.00, and was at the motel to pick up his purchase. In order to confirm their suspicions, the officers also talked to the motel manager, who indicated that the property was stolen. These facts demonstrate that the investigatory stop was "a minor intrusion on [Bethly's] personal security;" it was reasonably related to the observations that caused the GTF officers to become suspicious, and lasted only ten minutes, which was long enough to confirm the officers' suspicions. *Rickus*, 737 F.3d at 366. Therefore, the court concludes that the stop was a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," and was the "most reasonable course of action in light of the facts known to the [GTF] officers at the time." *Rickus*, 737 F.2d at 366 (citing *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 1923, 23 L.Ed.2d 612 (1972)). Accordingly, the stop was entirely proper under *Terry* and its progeny.

---

seizure was based upon reasonable suspicion. *See United States v. Rickus*, 737 F.2d 360, 365-66 (3d Cir. 1984) (noting that "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation").

In light of the court's determination that the GTF officers' stop of Bethly was based on reasonable suspicion and, therefore, legal, it follows that the officers were properly in a position to plainly view the prime rib and beer in the open trunk of Bethly's car. *See Texas v. Brown*, 460 U.S. 730, 737-38, 103 S.Ct. 1535 (1983) ("The question whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question.") In *Brown*, the Supreme Court clarified the meaning of "plain view," noting that it "is perhaps better understood . . . not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Id.* at 738-39. In the present case, because the investigatory stop that enabled Lewis to view the prime rib and beer was legal, his actual viewing of the beef and beer was also legal.

**B.     The Arrest**

Bethly next contends that the officers lacked probable cause to arrest him. Conversely, the Government asserts that the officers' reasonable suspicion ripened into probable cause after they questioned the motel's manager. The court agrees with the Government's assertion. The Supreme Court has stated that probable cause to justify an arrest means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627 (1979) (citations omitted). Furthermore, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime. . . . We [the Court] have made clear that the kinds and degree of proof and the

procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Id.* (citations omitted).

Here, as previously discussed in the *Terry* analysis above, the facts and circumstances known to the officers provided them with a reasonable suspicion that criminal activity was occurring. After briefly questioning Bethly, the officers discovered that he was at the Holiday Inn to pick up some excess meat that he had purchased from one of Oliver's cooks. However, the motel manager, *i.e.* the person most able to confirm whether employees were permitted to sell motel property, directly contradicted Bethly's story when he indicated to the officers that Bethly and Armstrong had stolen the meat. Tr. at 14, 49. Bethly makes much of the fact that the manager never authenticated the meat as property of the motel/restaurant complex. (D.I. 24, at 8.) The court, however, finds that it is reasonable to infer from the facts in the record that the meat belonged to the motel.[9] Thus, in addition to the observations of the GTF officers prior to the *Terry* stop, they now possessed facts and information that would indicate to a prudent person that Bethly and Armstrong had been engaged in the crime of theft and/or receiving stolen property – namely, the motel manager's statement that the meat was being removed from the back of the restaurant against policy and not in the ordinary

---

[9] The record facts regarding the meat are as follows: (a) the meat, wrapped in plastic, was removed from the motel/restaurant complex and placed into Bethly's trunk; (b) Bethly informed the officers that he was at the motel to pick up some excess meat he had bought from a motel/restaurant employee; (c) Bethly told the officers that the meat was left over and had been purchased for the restaurant for a party earlier that day; and (d) the manager, upon being questioned by the officers as to the accuracy of Bethly's and Armstrong's story, stated "this is not the way we do business here," and told the officers that the security guard had no right to be taking items out of the back of the restaurant. Tr. at 8,13-15, 48-49.

13

course of business. As such, the court concludes that the GTF officers' arrest of Bethly (and Armstrong) was valid.[10,11]

### C. The Search Incident to Arrest

Bethly also argues, in a footnote, that the search of his vehicle was not a valid search incident to arrest, or covered within the automobile exception to the warrant requirement. Bethly first contends that the search of the vehicle was improper because the officers did not have probable cause to arrest. Bethly next seems to contend, without explanation, that the search was invalid because it was not contemporaneous in space and time, and was not conducted to avoid destruction of evidence or for officer safety. (D.I. 24, at 12 n. 5.) The court is not persuaded by Bethly's arguments for several reasons.

First, the court has already determined that the officers conducted a valid warrantless arrest based on probable cause. As such, Bethly's argument regarding the lack of probable cause is without merit. The court also rejects Bethly's remaining arguments, because Supreme Court precedent

---

[10] Bethly contends that the arrest was invalid because the GTF Officers did not establish that Bethly knew he was in receipt of stolen property. (D.I. 24, at 8,9.) The court is not convinced by this argument for several reasons. First, as previously mentioned, "the validity of the arrest does not depend on whether the suspect actually committed the crime." *DeFillippo*, 443 U.S. at 37. Therefore, the police did not have to establish that Bethly was a knowing participant in the crime of theft and/or receiving stolen property in order to have probable cause to arrest him. Bethly's citations to cases purporting to support his argument that he had to "know" he was receiving stolen property are likewise misplaced. For example, Bethly cites *United States v. DiRe*, 332 U.S. 581, 593 (1948), and other cases, for the proposition that "mere presence on the premises without more, fails to establish probable cause." (D.I. 24, at 10.) Here, however, the GTF officers had more than Bethly's "mere presence" at the motel/restaurant; they had Bethly's admission that he was present at the motel/restaurant to pick up meat he had purchased from an employee and the manager's indication that Bethly and Armstrong were stealing the meat. Thus, *DiRe* is inapposite, and readily distinguishable from the present case.

[11] In addition, because the arrest was valid, the GTF officers properly seized the $1,583.00 that they found when they searched Bethly's person subsequent to his arrest.

dictates that an officer can search the passenger compartment of a vehicle incident to the lawful arrest of a "recent occupant." *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127 (2004). In *Thornton*, the Supreme Court affirmed the lower court's conviction of the defendant, holding that even when a suspect is a "recent occupant" of the vehicle, the officer may search the passenger compartment incident to a lawful arrest. *Id.* at 2132. The Court noted that an arrestee's status "does not turn on whether he was inside or outside the car at the moment that the officer first initiated contact with him." *Id.* The Court also noted that an arrestee's status as a recent occupant "may turn on his temporal or spatial relationship to the car at the time of the arrest and search." *Id.* at 2131.

In the present case, the court concludes that Bethly was a recent occupant of the sedan for the following reasons.[12] Lewis observed the sedan pull into the parking lot of the Holiday Inn. Lewis testified that did not observe Bethly get out of the vehicle at any time prior to the stop made by the remaining GTF officers responding to his radio call. Although he continued past Bethly's vehicle, Lewis testified that, "at the time [he] pulled [back] up [to the vehicle, Bethly] was just getting asked out of [it]." Tr. at 11. These uncontested facts demonstrate that Bethly was a recent occupant of the vehicle. As such, the GTF officers were entitled to search the entire passenger compartment. Further, because the GTF officers conducted the search of Bethly's vehicle at the scene of the incident, and shortly after he was removed from the vehicle and handcuffed, Bethly's argument that the vehicle search was invalid because it was not contemporaneous in space and time must fail. Accordingly, the court finds that the search of the Bethly's vehicle was a search incident

---

[12] Bethly does not appear to contend otherwise. However, for completeness, the court will address the argument that Bethly was not a recent occupant.

to his lawful arrest.[13] As a result, the officers' seizure of the Smith & Wesson revolver and ammunition, the gram of marijuana, and the four tablets of Ecstasy complied with the Fourth Amendment, and the court will deny Bethly's motion to suppress.

Dated: July 17, 2006

UNITED STATES DISTRICT JUDGE

---

[13] The Government also asserts that the seizure of the revolver, ammunition and drugs should be upheld because it inevitably would have been discovered when the officers conducted an inventory search of the vehicle per DSP procedure. The court need not address this assertion, however, because it has already determined that the police conducted a lawful search of the vehicle incident to Bethly's arrest.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  05-77 GMS |
| | ) | |
| LEONARD BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Evidence *Nunc Pro Tunc* (D.I. 10) is DENIED.

Dated: July 17, 2006

UNITED STATES DISTRICT JUDGE