IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 05-77-GMS |
| | ) | |
| LEONARD D. BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW OF THE UNITED STATES**

**NOW COMES** the United States of America, by and through its attorneys, Colm F. Connolly, United States Attorney for the District of Delaware, and Sophie E. Bryan and Beth Moskow-Schnoll, Assistant United States Attorneys for the District of Delaware, and hereby provides the following Proposed Findings of Fact and Conclusions of Law.

**I.    Proposed Findings of Fact**

Late on the evening of May 30, 2005, Delaware state law enforcement officers on the Governor's Task Force ("GTF")[1] were conducting surveillance in the area of the intersection of Route 273 and Harmony Road in Newark, Delaware. See Bench Trial Transcript ("Tr.") at 12-13. Among other businesses located at the intersection was a Holiday Inn hotel. Tr. at 13. The Holiday Inn complex included several two-story buildings containing hotel rooms, a one-story lobby building, and a restaurant, Oliver's Restaurant, which is attached to the lobby building. Tr. at 19; Government Exhibit ("Gov't Exh.") 2.

---

[1] The GTF is a partnership between the Delaware State Police and the Delaware Department of Corrections that, among other law enforcement duties, investigates crimes including weapons offenses, drug-dealing, and thefts. Tr. at 12.

Senior Probation Officer Mark Lewis, on duty that evening with his partner in his capacity as a member of the GTF, was conducting stationary surveillance of the area from an unmarked patrol vehicle located in the parking lot on the northern, or Route 273-bordering, side of the Holiday Inn complex. Tr. at 12-15. Other members of the GTF also were patrolling the area that evening, including Delaware State Police ("DSP") Detective Dewey Stout, who was conducting surveillance in his unmarked vehicle from the parking lot of the Getty gas station located across the street from the Holiday Inn. Tr. at 16, 48-49. The members of the GTF stayed in contact with one another via radio. Tr. at 16.

At approximately 11:30 p.m., Officer Lewis observed a man standing in front of Oliver's Restaurant for ten to fifteen minutes who, based on his attire, appeared to be a security guard. Tr. at 17. Officer Lewis then observed the security guard enter the hotel complex via the main entrance, re-emerge some time later, and resume standing on the northwest side of the hotel complex. Id. Officer Lewis testified that during the approximately ten to fifteen minutes the security guard was inside the hotel complex, he saw no patrons entering or exiting Oliver's Restaurant and the lights inside the restaurant were off, indicating that the restaurant was closed. Tr. at 21-22.

As the security guard continued to stand outside, Officer Lewis observed a four-door sedan pull into the hotel parking lot and saw the security guard make a gesture with his hand toward the car. Tr. at 17-18. The car then pulled around toward the rear of Oliver's Restaurant, and Officer Lewis drove his vehicle in a clockwise direction (i.e., in the opposite direction than the four-door sedan) to the rear of the hotel complex. Tr. at 18-19. When Officer Lewis reached the rear of the complex, he observed the four-door sedan parked behind Oliver's Restaurant. Tr.

at 19. As Officer Lewis drove by the sedan, he saw the security guard loading an object into the trunk of the car, while the driver of the car remained seated inside. Tr. at 19-20.

Officer Lewis radioed the other members of the GTF to report what he had observed, which he believed might be criminal activity, and to ask them to respond to the area behind the restaurant. Tr. at 22-23. Officer Lewis testified that he made this request for a number of reasons, including that it seemed out of place for a security guard, late at night, to be loading items into the back of a non-commercial vehicle from what appeared to be a closed business. Id.

When Officer Lewis pulled back around to the rear of the restaurant, he saw the driver of the four-door sedan, whom he identified in court as the defendant, being asked out of his car by Sergeant Sawyer, another GTF member. Tr. at 23. Officer Lewis observed the defendant standing near the driver's side door of the vehicle, no more than five feet away from the car, and the security guard standing near the rear of the vehicle. Id. Officer Lewis was able to look inside the trunk of the car, which was open, and therein observed a large object wrapped in clear plastic, which later was determined to be a side of beef, and a six-pack of Heineken beer. Tr. at 20, 23-24. The officers also observed that the back door to the restaurant was propped open. Tr. at 22.

Detective Stout, who had arrived on the scene, requested identification from the security guard and the defendant in order to determine whether there active warrants for either man. Tr. at 53. The security guard, who did not possess any form of identification on his person, identified himself as Reginald Armstrong, and a warrant check indicated an active capias for him based on failure to pay fines. Tr. at 54, 56. The defendant, Leonard Bethly, provided Detective Stout with two forms of identification, both in the name Keenan Bethly, which the police later determined was an alias and not the defendant's true name. Tr. at 54-56, 68-69. The first form

of identification provided by the defendant was a Delaware driver's license in the name Keenan J. Bethly, listing a date of birth of February 2, 1974, an address of 1313 North Walnut Street, Wilmington, Delaware address, and an issue date of May 12, 2003. Tr. at 54-55; Gov't Exh. 5. The second form of identification, which was titled "Safety Film Verification Card" and appeared to be some type of employee identification card, bore the name Keenan Bethly, the company name Tri-State Carpet, the date July 29, 2003, and a signature in the name of Keenan Bethly. Tr. at 68; Gov't Exh. 6. After running a warrant check for the defendant under the name Keenan Bethly, Detective Stout also ran a registration check for the defendant's vehicle, the four-door Buick sedan. Tr. at 56. Detective Stout determined that the car was registered to Keenan Bethly, as reflected in the certified copy of the Sate of Delaware Motor Vehicle Division vehicle record for the car that was introduced in evidence. Tr. at 56-57; Gov't Exh. 7.

The officers proceeded to interview the defendant and the security guard about the items placed in the trunk of the car and what they were doing in the area. Tr. at 24, 58. The defendant stated that he made arrangements with the security guard, Mr. Armstrong, to purchase beef and beer and was at the restaurant to collect these items.[2] Tr. at 58. Detective Stout heard Mr. Armstrong say that he made arrangements with an unidentified third party who worked at Oliver's Restaurant to retrieve the beef and the beer. Id. Sergeant Sawyer then went inside the

---

[2] On direct examination, the defendant testified that he was lying when he made these statements to the police. Tr. at 97-98. He contended that he came to the hotel complex at the request of Mr. Armstrong, who was an ex-boyfriend of one of the defendant's cousins, but had not made prior arrangements to purchase the food items. Tr. at 92-97. Attempting to justify his lying to the police, the defendant testified that after Mr. Armstrong told the police that one of the cooks in the restaurant told him to sell the meat and beer to the defendant, he echoed the story, "just going along with him, because obviously, it's something to go down [to the police station] and I don't want my fingerprints ran." Tr. at 97.

hotel complex to try to find a manager or other staff-member who could verify the above account. Id. After the manager was interviewed, the police placed the defendant and the security guard in handcuffs. Tr. at 25, 58-59. Approximately ten minutes elapsed between when the officers first arrived on the scene and when they placed the defendant and the security guard in handcuffs. Id.

Officer Lewis and Detective Stout proceeded to search the defendant's car. Tr. at 26, 59. Detective Stout entered the car from the driver's side door and was responsible for searching the driver's (or left-hand) side of the car interior, while Officer Lewis entered from the passenger side door and was responsible for searching the passenger's (or right-hand) side of the car interior. Tr. at 26, 59-60. As they searched the vehicle, Detective Stout observed the defendant, who was standing approximately fifteen to twenty feet away in front of the car, off to the left-hand side. Tr. at 60.[3] Detective Stout testified that the defendant was "very attentive . . . very watchful . . . [and] was watching us very closely" during the search of his car. Tr. at 62.

Officer Lewis's search of the front passenger compartment proceeded in a clockwise fashion. Tr. at 26. In the course of his search, Officer Lewis opened the glove box, which was unlocked, and found that it "opened up farther than what it should have," thereby revealing a one- to two-inch gap at the rear exposing the dashboard frame. Tr. at 26-27. Officer Lewis

---

[3]Detective Stout testified that it was his usual practice when conducting the search of a car to observe the operator or owner of the vehicle. Tr. at 61. Detective Stout explained that he does so not only for purposes of officer safety, but also because the owner/operator's demeanor can provide useful information. Id. Regarding searches for illegal contraband, Detective Stout testified that, in his experience, suspects often look towards the location where contraband is secreted. Id. Furthermore, he testified that "[t]ypically, if you find illegal contraband in the car, [and] the subject is there while you are searching it, they show a lot of interest in what you are doing while you are conducting your search." Id.

suspected that the glove box was either broken or had been tampered with, and inserted his hand into the gap to further explore the area. Tr. at 27. Officer Lewis reached his hand "behind the glove box and up off to the right [] side of the dashboard," where he felt a latex glove. Id. Officer Lewis removed the latex glove and found that it contained approximately sixteen rounds of nine-millimeter ammunition. Tr. at 27-29; Gov't Exhs. 3 and 3A.

Based on his training and experience, Officer Lewis suspected that a handgun might be located in close proximity to where he found the bullets, and he pushed down on the glove-box door to continue his search of the dashboard frame area. Tr. at 30. Officer Lewis then located a Smith & Wesson .38-caliber revolver, serial number CAT9477, on the dashboard frame approximately eighteen to twenty-four inches toward the driver's side of the car from where he found the latex glove with the ammunition. Tr. at 30-31; Gov't Exh. 1.

Officer Lewis testified that a person sitting in the front passenger seat of the defendant's car could reach both the latex glove containing the bullets, as well as the handgun. Tr. at 32-33. Officer Lewis testified that a person sitting in the driver's seat of the car also would be able to reach the handgun – which was located on the bottom dashboard frame, closer to the driver's side of the car than the glove with the bullets – albeit with some difficulty. Tr. at 41, 44. Officer Lewis explained that although it was necessary to "reach off to the right" in the space behind the glove box to recover the glove with the bullets, it was not necessary to reach very far to find the gun, which, "[i]f you reached straight down in the glove box, that's where the weapon was located on the frame." Tr. at 40-41, 45.

After finding the handgun, Officer Lewis announced its discovery to his fellow officers

on the scene. Tr. at 34, 63, 72-73.[4] At this point, the defendant, who was handcuffed behind his back and standing approximately twenty feet away from the car, fled the scene on foot in an attempt to escape. Tr. at 63. As testified to by Detective Stout, who gave chase after the defendant, the defendant ran through a passageway connecting Oliver's Restaurant to the hotel-room buildings; continued across the front parking lot of the hotel complex; dove over a four-foot high split-rail fence at the edge of the parking lot; ran eastbound on the shoulder of Route 273; and started running up the on-ramp for I-95, before he was apprehended by Detective Stout. Tr. at 63-65. Detective Stout testified that when he finally apprehended the defendant, the defendant stated that he "didn't want to go back to Wisconsin." Tr. at 71.

Thereafter, Detective Sebastianelli, another GTF member on the scene, photographed the handgun in the position in which Officer Lewis found it. Tr. at 33; Gov't Exh. 4. Officer Lewis turned the handgun over to Detective Sebastianelli for unloading, and saw his colleague unload four live rounds of ammunition in the cylinder and one spent round from the handgun. Tr. at 30-

---

[4]Detective Stout testified that when Officer Lewis found the glove with the ammunition, both he and Officer Lewis were in the course of searching the interior of the vehicle. Tr. at 73. Officer Lewis notified only Detective Stout about his initial finding and continued to search the glove-box area, soon finding the handgun. Id. When he found the handgun, Officer Lewis announced the discovery "loud for everyone that was outside." Id.

The defendant testified on direct examination that Detective Stout was questioning him at the back of the car when Officer Lewis found the ammunition. Tr. at 102-103. This testimony is not credible, in light of the credible and consistent testimony by Officer Lewis and Detective Stout regarding the sequence of events and the respective locations of the parties, including the defendant, during the course of the vehicle search. Detective Stout explained that he questioned the defendant prior to the car search and that, during the search, the defendant was standing approximately twenty feet in front of the car. Tr. at 60. Both Detective Stout and Officer Lewis testified that they segmented the car in order to perform the search, with Detective Stout searching the driver's side of the car while, simultaneously, Officer Lewis searched the passenger side. Tr. at 26, 59, 73-75.

31; Gov't Exh. 1A. The police subsequently tested the handgun for fingerprints and, as the parties have stipulated, found no discernable fingerprints. Gov't Exh. 8.

After the police transported the defendant back to the DSP troop, they submitted his fingerprints for identification purposes. Tr. at 66. The police thereby learned the defendant's true name, Leonard Bethly, and the fact that he was a fugitive escapee from Wisconsin state prison. Id. As the parties have stipulated, the defendant pled guilty to the charge of felony murder[5] on or about February 1, 1993, in the Circuit Court for the State of Wisconsin, in and for Milwaukee County, and was sentenced to twenty years imprisonment. Gov't Exh. 9. At trial, the defendant testified on direct examination that after serving just over half of his prison sentence, he escaped from custody, assumed the identity of his brother, Keenan Bethly, and fled to Delaware. Tr. at 78-80.

With respect to the car he was driving on the night of May 30, 2005, the defendant testified that after his escape from prison, his brother purchased the car for him in Milwaukee, Wisconsin,[6] and the defendant drove it to Delaware. Tr. at 80-81. The defendant testified that the car was a "go-to car" for the unlicensed, off-the-books auto repair business he was running in Wilmington, Delaware, at the time he was arrested. Tr. at 87-88. The defendant claimed that he used the car for both business and non-business purposes, and that his three co-workers – whom he identified as Mark Herron, Daman Mills, and "an older guy, we just called him Rocco" – had access to the car. Tr. at 90.

---

[5] The defendant provided a handgun to a co-conspirator, which was used to shoot and kill their robbery victim. Gov't Exh. 9.

[6] The defendant testified that he subsequently repaid his brother the purchase price of the car. Tr. at 81.

The defendant claimed that he had not seen the handgun at issue prior to its discovery by the police in his car on the evening of May 30, 2005. Id. When asked by his attorney if "there ever was anybody in the shop, in the business, who carried a gun like this even though you may not have seen it?," the defendant responded, "No, sir. We are mechanics. We don't need guns." Tr. at 91. The defendant claimed that he had no idea how the gun came to be placed in his car, id., and hypothesized that it "could have been there before I even bought the car." Tr. at 108. The defendant testified that he ran away after the gun was found in his car because he did not want to return to jail. Tr. at 105-06.[7]

## II. Proposed Conclusions of Law

On August 11, 2005, the Grand Jury for the District of Delaware charged the defendant, Leonard Bethly, with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Docket Item ("DI") 1.[8] The elements of the charged offense are as follows: (1) prior to the date of the offense alleged in the Indictment, the defendant had been convicted in any court of a crime punishable by imprisonment for a term

---

[7]The defendant testified, "I didn't want to go to jail. I didn't want to go back to that maximum facility because I just did not want to go back. I had earned my freedom. I deserved to be free." Tr. at 105-06.

[8]Specifically, the Indictment charged that:

On or about May 31, 2005, in the District of Delaware, Leonard D. Bethly, the defendant, knowingly possessed a firearm, that is, a Smith and Wesson .38 caliber revolver, serial number CAT9477, which had been transported in interstate commerce to Delaware, having been convicted on or about April 9, 1993, in the Felony Court of the State of Wisconsin in and for Milwaukee County, of an offense punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

DI 1.

exceeding one year; (2) the defendant knowingly possessed the firearm charged in the Indictment; and (3) the firearm charged in the Indictment was in or affected interstate commerce before coming into the defendant's possession. United States v. Dodd, 225 F.3d 340, 344 (3d Cir. 2000).

The defendant elected to waive his right to trial by a jury, see DI 39, and the case proceeded via bench trial on February 13, 2007. See DI 41. Following trial, only the second element of the charged offense (i.e., the defendant's possession of the firearm) is in dispute. The first and third elements, which are undisputed, are discussed at the outset.

### A. The Defendant Has a Prior Felony Conviction and, Therefore, is Person Prohibited from Possessing a Firearm Under Federal Law.

With regard to the first element of the offense, the existence of a prior felony conviction, the parties stipulated that on or about February 1, 1993 (i.e., prior to the time the defendant was alleged to have possessed the firearm at issue), the defendant was convicted of felony murder in the Circuit Court for the State of Wisconsin, in and for Milwaukee County, and sentenced to twenty years imprisonment. Gov't Exh. 9. The defendant also testified on direct examination to the fact of this conviction and sentence. Tr. at 77-78. The government, therefore, has established this element of the offense beyond a reasonable doubt. On account of this conviction, the defendant was prohibited under 18 U.S.C. § 922(g)(1) from possessing a firearm.

### B. The Subject Firearm was Manufactured Outside of Delaware and, Therefore, Traveled in Interstate Commerce Prior to Being Recovered from the Defendant's Car on May 30, 2005.

The parties stipulated that the subject firearm – a Smith and Wesson .38 caliber revolver, serial number CAT9477 – was manufactured in the Commonwealth of Massachusetts and,

therefore, traveled across state lines prior to being found by the police in the defendant's car in Newark, Delaware on May 30, 2005. Gov't Exh. 8. This evidence that the subject firearm was manufactured outside of the state in which it was recovered "provides the requisite nexus to, and proof that the firearm[] traveled in, interstate commerce." United States v. Leuschen, 395 F.3d 155, 161 (3d Cir. 2005). Accordingly, the government has established the third element of the offense beyond a reasonable doubt.

### C.     The Defendant Knowingly Possessed the Subject Firearm.

The evidence also establishes, beyond a reasonable doubt, that the defendant knowingly possessed the subject firearm – the final element of the charged offense. Here, the gun was not seized from the defendant's person, but, rather, was recovered from the interior of his car. Accordingly, the government must prove that the defendant had "constructive possession" of the firearm by establishing that he had "the power and intent to exercise both dominion and control over the object he . . . is charged with possessing." United States v. Garth, 188 F.3d 99, 112 (3d Cir. 1999). As the Third Circuit has explained, constructive possession requires knowledge of an object's existence, as well as "dominion and control" over it, the former being a logical predicate for the latter. United States v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992). The government has met its burden by proving, beyond a reasonable doubt, that the defendant knew of the presence of the handgun in his car and exercised dominion and control over it.

The first factor tending to establish the defendant's knowledge of, and dominion and control over, the handgun is his ownership and operation of the car where the handgun was found. In the course of considering contraband found in a vehicle, the Third Circuit has instructed that "[o]wnership and operation of the car are highly relevant facts," because

"[c]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware, and usually knows what is in that vehicle."[9] Iafelice, 978 F.2d at 97. Of course, ownership and operation "must be considered in the context of the surrounding circumstances, which may either reinforce or undercut the significance" of those factors. Id.; see also United States v. Brown, 3 F.3d 673, 683 (3rd Cir.1993) (finding ownership and operation of a vehicle, standing alone, insufficient to

---

[9] The defendant did not dispute that he owned the car and operated it on the night in question. Through self-serving testimony, however, he attempted to speculate about who else might have stored the gun in his car – for example, his co-workers or the prior owner of the car. His testimony in this regard is not credible, lacks any supports in the record evidence, and cannot serve to create a reasonable doubt regarding his possession of the gun. See, e.g., United States v. Hernandez, 176 F.3d 719, 728 (3d Cir. 1999) (defining "reasonable doubt" as "a doubt based upon reason rather than whim, possibilities or supposition").

Regarding the defendant's co-workers, with whom he claimed he shared access to the car, the defendant never witnessed any of them with a gun, Tr. at 90-91, and the defendant himself testified that none of his co-workers possessed a gun or had need of a gun. Id.

The "inherited gun" theory (i.e., that the gun was already in the car when the defendant acquired it in May 2003) is similarly unavailing. The theory depends upon several implausible predicates: (1) the used car purchased for the defendant by his brother in Wisconsin – a car purchased to assist the defendant after he escaped from prison while serving a sentence for a crime involving a handgun and began living under an assumed identity – just happened to contain a handgun; (2) in the course of owning and operating the car for over two years, the defendant never noticed the handgun, which was visible through a gap at the rear of the glovebox and detected by the police within minutes of their searching the car.

In addition to the absence of any testimonial support for the defendant's "inherited gun" speculation, the theory is contradicted by the extant physical evidence. The handgun, which is in evidence, bears no indication of rust or other decay, nor does the latex glove containing the ammunition that was found nearby. Considering where these items were found – namely, on the interior frame of the car's dashboard, between the passenger compartment and the engine block – their physical integrity at the time they were found renders it implausible that they were secreted in the car for more than two years prior to being discovered by the police.

The defendant's hypothesizing about how the gun came to be located in his car, speculation that is untethered to any record evidence or concrete facts, fails to meet the minimum standard for a reasonable doubt, i.e., "one based upon reason." Victor v. Nebraska, 511 U.S. 1, 17 (1994) (citations omitted). The defendant's "fanciful doubt is not a reasonable doubt." Id.

establish constructive possession of contraband found therein, and holding that "additional evidence must link the defendant to the [contraband]"). In other words, "'knowing possession can be inferred from the defendant's control over the vehicle in which the illicit substance is contained if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" Iafelice, 978 F.2d at 97 (quoting United States v. Anchondo-Sandoval, 910 F.2d 1234, 1236 (5th Cir.1990)). Here, in addition to the defendant's ownership and operation of the car, there is significant circumstantial evidence supporting the conclusion that he knowingly possessed the firearm found therein.[10]

The fact that the handgun was within the defendant's reach inside the car is one factor supporting the conclusion that he was in constructive possession of it. See, e.g., United States v. Lopez, 271 F.3d 472, 487 (3d Cir. 2001) (finding the location of a firearm underneath a car's front seat, and "therefore within [the defendant's] reach," among the factors that "could easily justify the inference . . . of [his] constructive possession of the gun"); United States v. Bellinger, 461 F. Supp.2d 339, 347 (E.D. Pa. 2006) ("Although proximity to contraband is not dispositive,

---

[10]To the extent the defendant argues that the government cannot meet its burden because there is no "direct evidence" of his possession of the handgun – for example, a witness who saw him holding it or the detection of his fingerprints on it – the lack of such evidence is neither exceptional nor determinative. The Third Circuit has explained that:

> [i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips; and considering all the facts and drawing upon rational inferences therefrom, a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime for which he is charged.

Iafelice, 978 F.2d at 98. In the present action, for the reasons set forth infra, the facts in evidence and the rational inferences therefore support finding the defendant guilty beyond a reasonable doubt.

when analyzing constructive possession of objects inside a vehicle proximity is a substantial consideration.").

Additional circumstantial evidence supporting constructive possession is found in the defendant's conduct toward the police on the scene. First, as the defendant acknowledged during his direct examination, he lied to the police repeatedly on the evening in question. In addition to misrepresenting the circumstances surrounding the apparent theft of property from Oliver's Restaurant, and his involvement therewith, the defendant lied to the police about his true identity and presented them with several fraudulent forms of identification. Evidence "that the defendant lied to police about his identity," as exists here, is among "[t]he kind of evidence that can establish dominion and control." United States v. Jenkins, 90 F.3d 814, 818 (3d Cir. 1996).

Even more notable, however, is the defendant's conduct during the search of his car and his attempt to escape immediately after the discovery of the handgun, both of which "demonstrate[] guilty knowledge." Iafelice, 978 F.2d at 97 (internal citations omitted). The defendant was aware at the time of the search that he faced a significant penalty if he was found in possession of a handgun. See Tr. at 105 ("When I got sentenced, the last judge said the next time I get caught with a gun I'm going to do 25 years in jail."). Accordingly, the defendant observed the search of his car closely, waiting to see if the police would find the gun hidden at the rear of the glove box. Detective Stout described how the defendant was "very attentive . . . very watchful . . . [and] was watching [the police officers] very closely" during the search. Tr. at 62. The defendant's conduct during the search was consistent with that of someone who had hidden illegal contraband in a location being searched and was concerned about its discovery

Further demonstrating the defendant's guilty knowledge was his attempt to flee once the

police found the handgun in his car. It is well-established that flight by a defendant is probative of his guilty knowledge. United States v. Scheffer, 523 U.S. 303, 331 (1998) (noting "flight" as "evidence of 'consciousness of guilt;'"); see also United States v. Pungitore, 910 F.2d 1084, 1151 (3d Cir. 1990) ("Evidence of a defendant's flight after a crime has been committed is admissible to prove his consciousness of guilt."). Furthermore, in a recent, albeit non-precedential, decision, the Third Circuit held that flight evidence also is "admissible as circumstantial evidence of guilt to be considered with the other facts of the case." United States v. Katzin, 94 Fed. Appx. 134, 138 (3d Cir. 2004). Here, whether the defendant's attempt to escape is considered as direct evidence of his "consciousness of guilt," or circumstantial evidence of his guilt, the end result is the same: it is yet another factor supporting the finding that the defendant constructively possessed the firearm located in his car.[11]

The undisputed evidence shows that the handgun was found in the defendant's car, which he had registered in Delaware under his assumed name; the defendant was driving the car on the night in question and had exclusive possession of the vehicle that evening; the defendant stated that the other people he claimed had access to the vehicle neither possessed a handgun nor had

---

[11]On direct examination, the defendant attempted to explain away his flight from the scene, contending that he ran away not because the gun was his, but because he did not want to be sent back to Wisconsin, from whence he escaped from prison. If the defendant's concern was being identified as fugitive escapee, the motive to run existed well before the discovery of the handgun. As the defendant admittedly was aware, see Tr. at 97, if he was arrested in relation to the stolen beef and beer, it was likely that his fugitive status would be discovered once he was fingerprinted by the police. But the defendant did not run when the police first arrived on the scene and began questioning him. Nor did he run when he and Mr. Armstrong were placed in handcuffs by the police, at which point his arrest and eventual identification appeared to be a significantly more likely possibility. The defendant's flight, therefore, cannot be explained by his concern over the possible discovery of his true identity. The only logical explanation for the timing of the defendant's flight – i.e., after the discovery of the gun in his car – is that he knew that the gun was his and that he faced a significant penalty as a felon-in-possession of a firearm.

any reason to; the defendant had access to the handgun – which was located on the dashboard frame at the rear of the unlocked glove-box – from the driver's seat of the car; the defendant lied to the police upon being questioned, including by providing them with false identification; the defendant acted suspiciously during the search of his car; and the defendant fled from the scene after the handgun was discovered. These facts, and the rational inferences to be drawn therefrom, demonstrate beyond a reasonable doubt that the defendant constructively possessed the handgun found in his car. Cf., United States v. Bellinger, 461 F. Supp.2d 339, 350 (E.D. Pa. 2006) (denying motion for acquittal or new trial after finding combination of defendant's proximity to gun found under seat in car he was riding in and, inter alia, his "relative control over the car," his "suspicious behavior," and his "evasive conduct," sufficient to support jury finding beyond a reasonable doubt that the defendant constructively possessed the gun.).

**WHEREFORE**, the United States requests that the Court find the defendant guilty of the charged offense.

    Respectfully submitted,

    Colm F. Connolly
    United States Attorney


By:   /s/
    Sophie E. Bryan
    Assistant United States Attorney
    Beth Moskow-Schnoll
    Assistant United States Attorney

Dated: April 20, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 05-77-GMS |
| | ) |
| LEONARD D. BETHLY, | ) |
| | ) |
| Defendant. | ) |

**CERTIFICATE OF SERVICE**

I, Sophie E. Bryan, Assistant United States Attorney for the District of Delaware, hereby certify that on the 20th day of April 2007, I caused to be electronically filed the **Proposed Findings of Fact and Conclusions of Law of the United States** with the Clerk of the Court using CM/ECF. Said document is available for viewing and downloading from CM/ECF. I further certify that two copies of the foregoing notice were sent via U.S. mail, postage prepaid, to the attorney of record as follows:

        Elliot Cohen, Esquire
        Two Penn Center Plaza
        15th Street & JFK Boulevard
        Suite 1516
        Philadelphia, PA 19102

                                                /s/
                                            Sophie E. Bryan
                                            Assistant United States Attorney
                                            United States Attorney's Office
                                            1007 Orange Street, Suite 700
                                            P.O. Box 2046
                                            Wilmington, DE 19899-2046
                                            (302) 573-6277
                                            sophie.bryan@usdoj.gov