**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 05-77 GMS |
| | ) | |
| LEONARD BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Sophie E. Bryan, Esquire, and Beth Moskow-Schnoll, Esquire, of the UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware. Attorneys for Plaintiff.

Elliot Cohen, Esquire, of LOUIS T. SAVINO & ASSOCIATES, Philadelphia, Pennsylvania. Attorney for Defendant.

_____

**<u>OPINION</u>**

September 19, 2007
Wilmington, Delaware

**SLEET, Chief, District Judge**

**I.    INTRODUCTION**

On August 11, 2005, the Grand Jury for the District of Delaware indicted Leonard Bethly ("Bethly") on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Thereafter, Bethly filed a motion to suppress evidence, which the court denied on July 17, 2006. On February 13, 2007, the court held a bench trial in the matter.[1] The court subsequently directed the parties to filed proposed findings of fact and conclusions of law. After having considered the testimony elicited during the trial and the arguments presented in the parties' submissions on the issues, the court concludes that the government did not prove the elements of the charged offense beyond a reasonable doubt, and finds Bethly not guilty of the offense charged.

**II.    FINDINGS OF FACT**

During the bench trial, the United States called two witnesses: Mark Lewis ("Lewis"), a Senior Probation Officer employed by the Delaware Department of Corrections (the "DOC"), and Detective Dewey Stout ("Stout"), a Delaware State Police (the "DSP") detective. Both men were also members of the Governor's Task Force (the "GTF")[2] during the time in question. Bethly testified on his own behalf, and did not call any other witnesses. After listening to the testimony of

---

[1] Prior to conducting trial, Bethly, the government, and the court consented to and executed a waiver of jury trial (D.I. 39).

[2] Lewis testified that the GTF is a partnership between the DOC and the DSP that investigates drug-dealing, thefts, weapons offenses and provides supervision to individuals on probation by conducting curfew checks. (See Transcript of Bench Trial ("Tr.") at 12.)

each witness, and observing the demeanor of each, the court concludes that Lewis', Stout's, and Bethly's accounts of the facts are credible. The following represents the court's essential findings of fact as required by Rule 23(c) of the Federal Rules of Criminal Procedure.[3] Having previously issued findings of fact and conclusions of law based on the GTF officers' stop and arrest of Bethly, the findings herein are limited to the events occurring after Bethly was placed under arrest by GTF officers, late in the evening, on May 30, 2005.

After placing Bethly in handcuffs, Lewis and Stout conducted a search of his vehicle. (See Transcript of Bench Trial ("Tr.") at 26.) Stout entered the vehicle from and searched the driver's side, while Lewis entered from and searched the passenger side. (Id. at 26, 59-60.) While conducting the search, Stout observed Bethly standing about 15-20 feet in front of the vehicle and watching he and Lewis "very closely."[4] (Id. at 61-62.) Stout also testified, however, that, while conducting the vehicle search, Bethly could probably see him and Lewis, but would not have been able to see the glove box compartment or the area that they were searching. (Id. at 73-74.) During the course of his search, Lewis opened the glove box, which was unlocked, and discovered that it

---

[3] Many of the facts of this case are recited in the court's Memorandum on the motion to suppress, *United States v. Bethly*, No. Crim. A. 05-77 GMS, 2006 WL 1995586 (D. Del. July 17, 2006). Accordingly, the court incorporates those findings into this opinion and makes only those findings of fact that are non-repetitive and necessary to resolve the issues tried before the court on February 13, 2007.

[4] Stout testified that, during a vehicle search, he always watches the person who is operating the vehicle or the vehicles. (Tr. at 61.) He does this for officer safety and also because the owner/operator's demeanor can provide useful information. (Id. at 61-62.) To give an example of useful information, Stout testified that, based on his training and experience, a suspect often looks toward the location of where he or she has placed illegal contraband. (Id. at 62.) Additionally, Stout explained that "[t]ypically, if you find illegal contraband in the car, [and] the subject is there while you are searching it, they show a lot of interest in what you are doing while you are conducting your search." (Id.)

"opened up farther than what it should have. It opened up far enough so [he] could reach [his] hand behind the glove box." (Tr. at 26.) Lewis testified that, when opened, the glove box revealed a one to two inch gap at the rear exposing the dashboard frame. (Id. at 27.) Lewis inserted his hand into the space created by the glove box and, "up off to the right [] side of the dashboard, [he] felt a latex glove." (Id.) Lewis removed the latex glove, which was later found to contain 16 rounds of nine-millimeter ammunition. (Id. at 27; Gov't Exs. 3 and 3A.) With regard to the placement of the latex glove behind the glove box, Lewis testified that, he would have to reach his hand about six inches to a foot inside to the right of the glove box to reach it from the passenger seat. (Tr. at 28.) He further testified that the glove was easily reachable from the passenger seat, and "would be a lot more difficult" to reach if he was sitting in the driver's seat, but he was sure it "could be done." (Id.)

     Based on his training and experience, Lewis suspected that there might be a firearm in the vicinity of the bullets and pushed down on the glove box. (Id. at 30.) As he pushed down on the glove box, he located a Smith & Wesson .38-caliber revolver on the frame of the dashboard. (Id. at 27, 30.) Lewis testified that the gun he found on the frame of the dashboard was approximately 18 inches to 2 feet away from where he found the latex glove that contained the ammunition. (Id. at 30.) He further testified that the gun was closer to the driver's side, and that it would be difficult for a person on the driver's side to open up the glove compartment and get the gun, but "[i]t probably wouldn't be impossible." (Id. at 41.)

     After finding the ammunition and firearm, Lewis announced their discovery to his fellow officers at the scene. (Id. at 34.) According to Stout, Lewis notified only him about the discovery of the glove containing the ammunition. (Id. at 72.) That is, Stout didn't think that anybody outside

the car heard Lewis' communication regarding the discovery of the ammunition. (Id.) Stout testified, however, that Lewis communicated his discovery of the gun "loud [enough] for everyone that was outside." (Tr. at 72-73.) Additionally, Stout testified that Bethly, still in handcuffs, began to run after Lewis communicated his discovery of the gun. (Id. at 63, 65.) Stout chased Bethly as he ran through a corridor connecting the hotel restaurant to the rooms, out to the front parking lot and dove over a split-rail fence. (Id. at 63.) Bethly then ran eastbound on the shoulder of Route 273 and continued up the on-ramp for Interstate 95, before Stout apprehended him. (Id. at 63-65.) When Stout asked Bethly why he ran away, Bethly responded that "he didn't want to go back to Wisconsin." (Id. at 71, 73.)

Detective Sebastianelli ("Sebastianelli"), another GTF officer that was on the scene, photographed the gun in the position that Lewis found it. (Id. at 30; Gov't Ex. 4.) Lewis then turned the gun over to Sebastianelli for unloading, and observed Sebastianelli unload four live rounds and one spent round of ammunition from the gun's cylinder. (Tr. at 30-31; Gov't Ex. 1A.)

With respect to the identification of the handgun, the parties stipulated that no discernable fingerprints were found on the firearm. (Tr. at 43; see Gov't Ex. 8.) Lewis testified that he did not know whose gun he found in the vehicle, how long it had been in the vehicle, or whether any other individuals might have had access to the vehicle. (Tr. at 42.) Stout also testified that he did not know anybody else that might have had access to Bethly's vehicle. (Id. at 71.)

After arresting Bethly, the officers transported him to the DSP troop and submitted his fingerprints for identification purposes. (Id. at 66.) From the fingerprint identification, Officer Stout

learned the defendant's true name, Leonard Bethly,[5] and also learned that he was a fugitive escapee from Wisconsin state prison. (Tr. at 66.) The parties have stipulated that Bethly pled guilty to the charge of felony murder on or about February 1, 1993, in the Circuit Court for the State of Wisconsin, in and for Milwaukee County, and was sentenced to twenty years imprisonment. (Gov't Ex. 9.) At trial, Bethly testified that, after serving a little more than half of his prison sentence, he escaped from custody, assumed the identity of his brother, Keenan, and fled to Delaware. (Tr. at 78-80.)

Bethly took the stand in his own defense and testified about the 1994 Buick he was driving on May 30, 2005. After his escape from prison, Bethly's brother Keenan "helped [Bethly] get an ID in his name," so that he could get a job.[6] (Id. at 79-80.) Keenan also purchased the vehicle for Bethly in Milwaukee, Wisconsin so that Bethly could go to Delaware. (Id. at 81.) While in Delaware, Bethly first worked maintenance for Tri-State Carpet, and then started his own garage with two friends on Lodge Street in Wilmington. (Id. at 82-83.) Bethly testified that the garage was an unlicensed, off-the-books auto repair business that bought cars, sold cars, and painted cars. (Id. at 87, 89-90.) The 1994 Buick was the "go-to car" of the business that Bethly and his three co-workers used "for going to get supplies, going to pick up parts, [and] going to the auction." (Id. at

---

[5] Prior to Bethly's arrival at the station and identification, he had assumed the identity of his brother, Keenan Bethly. For example, he was employed for a time as a maintenance worker with Tri-State Carpet using the name Keenan Bethly. (Tr. at 82-84; Gov't Ex. 6.) Bethly also testified that at least one of his three co-workers at his auto-parts shop knew him by the name Keenan Bethly. (Tr. at 109-11.)

[6] According to Bethly, he assumed the name Keenan Bethly because he was living a new life and "had to take a chance and show them [the institution] that [he] was able to be in society, that [he] wasn't the problem that they thought [he] was." (Id. at 84.) Additionally, Bethly testified that he assumed his brother's name because he was afraid of going back to Wisconsin as a fugitive. (Id. at 85.)

88.) Bethly also used the vehicle for non-business purposes. (Id.) According to Bethly, he and his three co-workers – Mark Herron, Daman Mills, and an older guy called Rocco – all had access to the vehicle and its keys at any given time. (Tr. at 88, 90.) Bethly also testified that the last time he drove the vehicle prior to May 30, 2005 was sometime in April. (Id. at 118.)

With respect to the gun, Bethly testified that he never had seen it prior to its discovery by the GTF officers on May 30, 2005. (Id. at 90.) Specifically, he testified that the it "wasn't my gun," and swore that the bullets were not his. (Id. at 108.) Bethly then hypothesized that the gun could have been in the vehicle before he bought it. (Id.) When asked by his attorney whether he knew of anybody in the shop or business that ever carried a gun like the one discovered by the GTF officers, Bethly replied "No sir. We are mechanics. We don't need guns." (Id. at 90-91.) Bethly further testified that he ran away after the gun was discovered in his vehicle because he "didn't want to go to jail. [He] didn't want to go back to that maximum facility because [he] just did not want to go back. [He] had earned [his] freedom. [He] did everything they asked [him] to do and they reneged on [him]." (Id. at 105-06.) He also testified that he explained to the officers that he had to run because he was an escaped convict from Wisconsin. (Id. at 107.)

### III.   CONCLUSIONS OF LAW

As previously mentioned, on August 11, 2005, the Grand Jury for the District of Delaware charged the defendant with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (See D.I. 1.) To show that Bethly was a felon in possession of a firearm, the government is required to prove the following three elements beyond a reasonable doubt: (1) prior to the date alleged in the Indictment, Bethly had been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; (2) Bethly knowingly

possessed the firearm charged in the Indictment; and (3) the firearm charged in the Indictment was in or affected interstate commerce before coming into Bethly's possession. *United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000). In the present case, the parties have stipulated to the first and third elements of the charged offense. That is, the parties have stipulated that, on or about February 1, 1993, Bethly was convicted of felony murder in the Circuit Court for the State of Wisconsin, in and for Milwaukee County, and sentence to twenty years imprisonment. (See Gov't Ex. 9.) The parties also have stipulated that the firearm charged in the Indictment – a Smith & Wesson .38 caliber revolver, serial number CAT9477 – was manufactured in the Commonwealth of Massachusetts and, therefore traveled across state lines prior to being found by the officers in Bethly's vehicle. (See Gov't Ex. 8.) Accordingly, the court's conclusions of law pertain to only the second element of the charged offense – whether Bethly knowingly possessed the firearm charged in the Indictment.

Here, the handgun was not seized from Bethly's person. Therefore, Bethly was not found in actual possession of the gun. Thus, the issue before the court is whether the evidence adduced at trial establishes, beyond a reasonable doubt, that Bethly had constructive possession of the firearm. A person has constructive possession over a thing if he or she "'knowingly has both the power and the intention at a given time to exercise dominion or control over [the] thing, either directly or through another person or persons.'" *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992) (quoting *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991)). The Third Circuit has adopted the view that "[c]onstructive possession necessarily requires both 'dominion and control' over an object and knowledge of that object's existence." *Iafelice*, 978 F.2d at 96 (citations omitted). In other words, the government must prove beyond a reasonable doubt that: (1) Bethly

had knowledge of the gun's existence; (2) Bethly had the power to exercise dominion and control over the gun; and (3) Bethly had the intent to exercise dominion and control over the gun. *United States v. Bellinger*, 461 F. Supp. 2d 339, 346 (E.D. Pa. 2006).

The government cannot establish dominion and control by showing Bethly's "mere proximity to the [gun], or mere presence on the property where it is located. . . ." *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993) (quoting *United States v. Davis*, 461 F.2d 1026, 1036 (3d Cir. 1972)). Further, "simple ownership or control of a vehicle is not enough on its own to establish constructive possession" of an item in the vehicle, "but rather, additional evidence must link the defendant to the [item]." *Brown*, 3 F.3d at 683. Some examples of additional evidence include, evidence that the defendant attempted to hide or to destroy the contraband, or that the defendant lied to police about his identity, *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996), or connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise. *Bellinger*, 461 F. Supp. 2d at 347 (quoting *United States v. Booker*, 436 F.3d 238, 242 (D.C. Cir. 2006)).

In the present case, the government offers the following circumstantial evidence, which it contends supports a finding that Bethly knew of and exercised dominion and control over the gun: (1) he owned and operated the vehicle where the handgun was found; (2) the handgun was within his reach; (3) he lied to the police about his identity and misrepresented the circumstances surrounding the apparent theft of property from the restaurant attached to the Holiday Inn; (4) he closely observed the search of his car; and (5) he attempted to flee after the GTF officers discovered the handgun in his vehicle. The court now addresses the proffered supporting evidence of constructive possession.

The government argues that Bethly's ownership and operation of the vehicle where the gun was found supports a finding of knowing possession, dominion, and control. The court agrees, as it is well settled in the Third Circuit, that "ownership and operation of the car are highly relevant facts," because "[c]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware and usually knows what is in that vehicle." *Iafelice*, 978 F.2d at 97. Here, Bethly testified that he owned the vehicle and drove it on May 30, 2005. (Tr. at 82.) The government acknowledges, however, that ownership and operation "must be considered in the context of the surrounding circumstances, which may either reinforce or undercut the significance of ownership and operation. . . ."[7] *Id.* (citing *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)). Therefore, the court turns to the additional circumstantial evidence cited by the government.

First, the government contends that the gun was within the defendant's reach inside the vehicle. The Third Circuit has, indeed, found the fact that a gun is within a defendant's reach "could easily justify the inference of . . . [his] constructive possession of the gun." *United States v. Lopez*, 271 F.3d 472, 487 (3d Cir. 2001). Nevertheless, the government's characterization or interpretation of the evidence, while perhaps plausible, would not seem to fit the definition of the phrase "within reach" that the Court of Appeals had in mind in *Lopez*. In *Lopez,* the defendant Crispin was the operator of the vehicle from which a firearm was recovered. Crispin told the officers there was a gun under the seat of the car, and a gun was then located by an officer under the

---

[7] One of the surrounding circumstances present here is the fact that other people, namely co-workers, had access to Bethly's vehicle. (Tr. at 88, 90.) This fact tends to undercut the government's argument regarding ownership and operation, because Bethly did not have exclusive access to the vehicle.

front driver's seat. The Circuit Court concluded that the gun's location placed it within reach of defendant, Crispin. Here, the gun was found on the frame of the dashboard after Lewis pushed down on the altered glove box. (Tr. at 27.) With respect to its location, Lewis testified that it would be difficult for a person on the driver's side to open up the glove compartment and get the gun, but "it probably wouldn't be impossible." (Tr. at 41.) Given the location of the gun and Lewis' testimony regarding the difficulty with which the driver of the vehicle could retrieve it, the court finds that the location of the gun in this case does not a support a finding of constructive possession. *Compare Lopez*, 271 F.3d at 487 (finding that the gun's location, under the vehicle's front seat, was within the defendant's reach); *Bellinger*, 461 F. Supp. 2d at 348 (finding that the defendant had constructive possession of gun found underneath a bucket seat in which he was sitting).

The government next cites the fact that Bethly lied to the police about his identity and misrepresented the circumstances surrounding the apparent theft of property from the restaurant. Evidence "that the defendant lied to police about his identity," is among "[t]he kind of evidence that can establish dominion and control." *Jenkins*, 90 F.3d at 818. The court agrees with the government that Bethly lied to the GTF officers about his identity and provided them with false forms of identification. The court, however, cannot agree that the evidence adduced at trial surrounding Bethly's false identification and the false documents supports a finding of constructive possession of the handgun. Here, Bethly testified that he was an escaped convict from Wisconsin. (Tr. at 78-80.) Because he was an escaped convict and wanted to start a new life, he asked his brother Keenan to get him an ID using Keenan's name. (Id. at 79-80.) Keenan also purchased the vehicle under his name so that Bethly could go to Delaware. (Id. at 81-82.) Upon his arrest, Bethly provided the GTF officers with his false ID and also an employment card bearing the name Keenan Bethly. (Id. at 68,

11

83-84.) Additionally, Bethly testified that he worked at Tri-State Carpet under the name Keenan Bethly, and that at least one of his three co-workers at the garage knew him as Keenan Bethly. (Id. at 82-84, 109-11.).

Clearly, apart from the presence of contraband such as the firearm in question, Bethly was well motivated to lie to law enforcement officials about his actual identity. The question, of course, is how does the court decide what to make of these facts and Bethly's testimony. In other words, should the court infer that Bethly lied about his identity because of his knowledge of the presence of the gun in the car, or because he didn't want to be returned to Wisconsin to finish out his sentence. Given the facts adduced at trial, and the court's favorable assessment of the credibility of Bethly's protestations from the witness stand as to his ignorance of the gun's presence, the court can not agree with the government's assertion that Bethly's prevarication about his identity or his perceived involvement in the attempted meat theft supports the inference that he was in constructive possession of the firearm at issue.[8]

The government relies heavily on Bethly's conduct during the search of his car, noting that he was very attentive and was watching the officers very closely. The government does not specifically argue, but seems to imply that this behavior constitutes suspicious conduct. As previously mentioned, suspicious conduct is a proper factor to consider in the constructive possession calculus. *See Bellinger*, 461 F. Supp. 2d at 347; *Iafelice*, 978 F.2d at 97. This court, however, is not willing to make the leap the government urges. That is, the court is reluctant to find that a person's attentiveness to a search of his or her vehicle alone is necessarily the behavior of

---

[8] Bethly's testimony that he had never seen th handgun or bullets prior to their discovery by the GTF officers on May 30, 2005, while arguably self-serving, was uncontroverted and credible under the circumstances of this case. (See Tr. at 90, 108.)

someone who has hidden contraband in the vehicle, and is concerned about its discovery. This court hopes that a person would take an interest in a search of his vehicle by police.[9] In fact, this Judge would be very attentive and watch police officers very closely if they were conducting a search of his own vehicle, and he would expect the same of his fellow citizens. The court, therefore, gives little weight to the government's argument regarding Bethly's conduct during the search of his vehicle.

The government's final argument concerns Bethly's attempt to flee once the GTF officers found the handgun in his vehicle. The court agrees with the government that it is well-settled that "[e]vidence of a defendant's flight after a crime has been committed is admissible to prove his consciousness of guilt." *United States v. Pungitore*, 910 F.2d 1084, 1151 (3d Cir. 1990). Additionally, the court is aware that in *United States v. Katzin*, 94 Fed. Appx. 134 (3d Cir. 2004), the Third Circuit held that evidence of a defendant's flight is "admissible as circumstantial evidence of guilt *to be considered with the other facts of the case*." 94 Fed. Appx. at 138 (emphasis added). When considering the defendant's attempt to flee in the context of the surrounding circumstances, the court concludes that this factor is neutral. As in the case of the explanation for his lies as to his identity, one could view Bethly's attempt to flee in two ways: (1) the timing of his flight, i.e. after

---

[9] This is particularly true here, where Bethly, an African American male, was placed in handcuffs for receiving a stolen piece of meat and six pack of beer prior to the search of his vehicle. Given the circumstances of Bethly's arrest and the documented tension between the police and African Americans, particularly black males, in certain communities, it is difficult for this court to ascertain why this particular defendant would not be attentive to a search of his vehicle. *See, e.g.*, Tracey Maclin, *Race and the Fourth Amendment*, 51 Vand. L. Rev. 333, 334-38 (documenting a history of police targeting of black people for excessive and disproportionate search and seizure); Judith G. Greenberg & Robert V. Ward, *Teaching Race and the Law Through Narrative*, 30 Wakeforest L. Rev. 323, 326-27 (pointing out the distrust of police by people of color).

he was already handcuffed and the handgun discovered in his vehicle, explains that he knew that the gun was his, and that he faced a significant penalty as a felon-in-possession of a firearm; or (2) Lewis said loud enough for Bethly to hear that he found ammunition and a handgun in the car (see Tr. at 34) and, upon hearing Lewis, he ran because he did not want the officers to discover that he was an escaped convict and send him back to Wisconsin. The government points to the timing of Bethly's attempt to flee and argues that if his concern was his fugitive status, the motive to run existed upon the officers' discovery of the beef and beer in his vehicle. As Bethly testified, however, he did not realize that the beef and beer were stolen until the security guard, Reginald Armstrong, began lying to the officers. (Tr. at 97.) He further testified that he consented to a search of his car and told Lewis that he had nothing to do with the stolen items, to which Lewis responded he would be let go if he did not do anything. (Id. at 98.) The court can reasonably infer from this testimony that Bethly believed he would be released. Moreover, Bethly did not run when Lewis communicated his discovery of the ammunition loud enough for those outside the vehicle to hear. He ran only after Lewis communicated his discovery of the gun. Thus, the court concludes that the timing of Bethly's attempt to flee is of no moment.

Additionally, while the government characterizes Bethly's testimony as an "attempt[] to explain away his flight from the scene," again, the court finds it credible and uncontroverted.[10]

---

[10] The court wonders at the fact that the government has completely discounted and relegated to footnotes Bethly's testimony regarding his knowledge of the gun, who had access to his vehicle, and why he ran from the officers. The court wishes to remind the government that, in a bench trial, it is the court as factfinder who makes credibility determinations. Contrary to the government's assertion that only their witnesses have proffered credible testimony, this court, sitting as factfinder, has determined that Bethly's uncontroverted testimony regarding his lack of knowledge of the handgun, the other people who had access to his vehicle and its keys, and his reason for running, which the government dismisses as self-serving, is indeed credible.

14

Specifically, Bethly testified that: he did not believe he did anything wrong (Id. at 98); he had never seen the handgun prior to its discovery (Id. at 90); and that he ran away after the handgun was discovered in his vehicle because he was an escaped convict and did not want to be sent back to prison in Wisconsin (Id. at 107). Stout also testified that he asked Bethly why he ran away and Bethly responded that "he didn't want to go back to Wisconsin." (Id. at 71, 73.) Accordingly, after examining all of the facts and evidence of the case, the court finds that Bethly's attempt to flee is neutral and, therefore, does not support a finding of constructive possession.

### IV.  CONCLUSION

For the aforementioned reasons, the court finds that the government did not meet its burden of proving the elements of the charged offense beyond a reasonable doubt. Specifically, the government did not prove beyond a reasonable doubt that Bethly had actual or constructive possession of the gun discovered in his vehicle. Therefore, the court finds the defendant not guilty of the offense of possession of a firearm by a prohibited person.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 05-77 GMS |
| | ) | |
| LEONARD BETHLY, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The defendant is adjudged not guilty of the offense of possession of a firearm by a prohibited person.


Dated: September 19, 2007         /s/ Gregory M. Sleet
                                  CHIEF, UNITED STATES DISTRICT JUDGE